**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW FIDLER and LISA FIDLER, husband and wife, | : : : | Case No. 4:15-CV-01602 |
| Plaintiffs, | : : | (Judge Brann) |
| v. | : : | |
| GEISINGER MEDICAL CENTER; MARCUS M. RIEDHAMMER, MD, CWSP; RIEDHAMMER, MARCUS M., M.D., P.C.; and KIMBERLY PERSARCHICK, PA, | : : : : : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**OCTOBER 5, 2017**

Before the Court for disposition is Defendants Geisinger Medical Center;

Marcus M. Riedhammer, M.D., CWSP; Riedhammer, Marcus M., M.D., P.C.; and

Kimberly Pesarchick, PA-C's Motion for Summary Judgment. For the following

reasons, this Motion will be granted.

## I.      INTRODUCTION

This is a professional negligence action stemming from the treatment

rendered to Plaintiff Lyle Matthew Fidler ("Plaintiff") in 2011 by Geisinger

Medical Center, Marcus M. Riedhammer, M.D., CWSP and Kimberly Pesarchick,

PA-C ("Geisinger Defendants") for a chronic, non-healing wound on the sole of

his right foot.  This action was instituted on August 16, 2015 by Complaint alleging two counts of medical malpractice by Plaintiff and a loss of consortium claim by Lisa Fidler.[1]  An Amended Complaint was thereafter filed on November 16, 2015.[2]  On December 7, 2015, the Geisinger Defendants filed an Answer, and the parties then commenced factual discovery.[3]  Following the completion of discovery, the Geisinger Defendants filed a Motion for Summary Judgment seeking the entry of final judgment in their favor on all claims.[4]  This Motion has since been fully briefed, and, following oral argument, is now ripe for disposition.[5]

## II.    FACTUAL BACKGROUND[6]

The facts of this case, while not in material dispute, tell an unfortunate, and as detailed below, legally time-barred tale.

### A. Plaintiff is treated by Dr. Ramil in Florida from February through March of 2011.  During this time, and unbeknownst to him, a Pathology Report confirms that chronic, non-healing wound on his right foot is actually melanoma *in situ*.

On February 9, 2011, Plaintiff visited Madelin Ramil, D.P.M.'s office in Florida, to address the non-healing wound on the sole of his right foot.[7]  Dr.

---

[1]    ECF No. 1.

[2]    ECF No. 15.

[3]    ECF Nos. 16 & 21.

[4]    ECF No. 44.

[5]    ECF Nos. 46, 49, 50, & 53.

[6]    The facts and all reasonable inferences are viewed in favor of plaintiff.

[7]    Compl. (ECF No. 1) ¶ 9, at 3; Ramil Records (ECF No. 46-2), at 6.

Ramil's records from this appointment relate the following information: (1) Plaintiff's problems began three years ago, and (2), while he had previously been treated by a podiatrist in Pennsylvania, the wound had since healed and reopened several times.[8] Dr. Ramil planned to rule out a neoplasm and debride the wound during the next visit.[9] She thereafter biopsied the wound on February 18, 2011, and sent the specimen to Bradley W. Bakotic, D.P.M., D.O. at Bako Pathology Services.[10]

Dr. Bakotic issued his first pathology report on February 24, 2011. This report both requested a follow-up biopsy be performed by Dr. Ramil and further noted the following:

> Although the diagnosis of malignant melanoma is overwhelmingly favored in this case, because this lesions cytologic features are unusually bland and there is associated desiccation artifact, that diagnosis cannot be made with absolute certainty. A definitive diagnosis will be rendered upon review of the follow-up biopsy.[11]

Dr. Ramil performed a second biopsy the next day and sent the skin specimen to Dr. Bakotic.[12] Following a subsequent appointment with Plaintiff on March 4,

---

[8]   Ramil Records (ECF No. 46-2), at 6.

[9]   *Id.*

[10]  *Id.* at 6 & 9 (Bako Pathology Services Podiatric Pathology Report).

[11]  *Id.* at 9 (2/24/2011 Bako Pathology Services Podiatric Pathology Report).

[12]  *Id.* at 4 (2/24/2011 Progress Record).

2011, Dr. Ramil noted that the wound had healed and that she was awaiting the results of the second biopsy.[13]

On March 10, 2011, Dr. Bakotic issued his second pathology report ("2011 Pathology Report"), which contained the following diagnosis:

> MALIGNANT MELANOMA IN SITU ARISING IN ASSOCIATION WITH INTRA-DERMAL CONGENITAL NEVUS. PROBABLE.[14]

In the comment section to his Pathology Report, Dr. Bakotic further described this diagnosis as "extremely atypical intra-epidermal melanocytic proliferation arising in association with a prominent intra-dermal component which lacks significant atypia."[15]  In his deposition, Dr. Bakotic confirmed his findings concerning the epidermal (top layer of the skin) and dermal (lower layer of the skin) layers of the skin, as follows:

> Q. So in layman's terms, I think I sort of repeated what you just said, but you had determined, based on the microscopic findings that you could see, that the cancerous cells that you thought existed in the epidermis had not penetrated into the dermal section?
>
> A. That was my opinion, yeah.[16]

Due to this "atypia," however, Dr. Bakotic sent the case to Philip LeBoit, M.D. of the University of California, San Francisco for a second opinion.[17]  Plaintiff

---

[13]   Ramil Records (ECF No. 46-2), at 3 (3/4/2011 Progress Record).

[14]   *Id.* at 7 (3/10/2011 Bako Pathology Services Podiatric Pathology Report).

[15]   *Id.*

[16]   *See* Dep. of Bradley Bakotic (ECF No. 46-4) at 29:9-15.

returned to Dr. Ramil for an appointment on March 30, 2011 during which Dr. Ramil noted that there was no infection and the wound was healing.[18]

Plaintiff thereafter returned to his home in Pennsylvania for the springtime,[19] and Dr. Ramil's records do not indicate further treatment.[20] Importantly, for purposes of this action, Dr. LeBoit thereafter rendered his second opinion in which he concurred with Dr. Bakotic's previous finding by noting the following:

> A – PREDOMINANTLY INTRADERMAL MELANOC YTIC NEVUS WITH CONGENITAL FEATURES, ULCERATED (216.7)
>
> (RIGHT PLANTAR, MEDIAL FOREFOOT, CENTRAL)
>
> . . .
>
> NOTE:    The dermal portion of this specimen appears to be a nevus with congenital features. The junctional component has large, irregularly shaped nests and is of more concern. See note (F) for overall considerations.[21]

Based on this corroboration,[22] Dr. Bakotic issued an Addendum Report in which he wrote the following:

> ADDENDUM COMMENT: The consultants in this case, Doctor Philip LeBoit, M.D., concurs with interpretation of the intradermal components of this lesion as a benign congenital nevus.

---

[17]   Ramil Records (ECF No. 46-2), at 7 (3/10/2011 Bako Pathology Services Podiatric Pathology Report).

[18]   *Id.* at 3 (3/30/2011 Progress Record).

[19]   Dep. of Lyle Matthew Fidler (ECF No. 46-6), at 444:9-13.

[20]   Ramil Records (ECF No. 46-2), at 2 (10/13/2011 Progress Record).

[21]   *See* UCSF Dermatopathology and Oral Pathology Service Slide (ECF No. 46-7), at 2.

[22]   *See* Dep. of Bradley Bakotic (ECF No. 46-4) at 30:15-19.

. . .

> In this context and in light of the clinical history in this case complete but conservative excision of the lesion in question is advised.[23]

Dr. Bakotic testified both sending this report to Dr. Ramil, and produced delivery log confirming this statement.[24] [25]

> **B. From August through October of 2011, Plaintiff is treated by Geisinger Defendants. During this time, Geisinger Defendants neither independently diagnosed Plaintiff, nor did they receive the 2011 Pathology Report confirming a melanoma diagnosis.**

Plaintiff was, by this point, discouraged with the lack of progress concerning his wound, and without knowledge of this Addendum Report and its recommendation of complete excision of the wound. He next sought treatment with Geisinger Defendants.[26]

On August 9, 2011, Plaintiff presented for the first time to Marcus M. Riedhammer, M.D. for a "Wound Consult."[27] Dr. Riedhammer's progress note from that date contains the following synopsis of Plaintiff's treatment history:

> Patient reports an 18 month HX of the right plantar foot ulcer that heals and recurs. He believes it began after attempting to freeze a

---

[23] *See* Bako Pathology Services Podiatric Pathology Report Addendum (ECF No. 46-8), at 3.

[24] *See* Dep. of Bradley Bakotic (ECF No. 46-4) at 46:20-47:1; *see also* Delivery Log (ECF No. 46-8) at 4.

[25] While Dr. Ramil denies receiving the report (Dep. of Madelin Ramil (ECF No. 46-5), at 96:4-12), I nevertheless note that the undisputed facts demonstrate that Geisinger Defendants were in possession of this Report. Furthermore, as will be explained throughout, this fact is not material as Plaintiff's claims fail as a matter of law even assuming Dr. Ramil's receipt.

[26] Dep. of Lyle Matthew Fidler (ECF No. 46-6) at 454:12-25.

[27] *See* August 9, 2011 Progress Note (ECF No. 46-9) at 2.

plantar wart with an at home wart kit. Patient has seen multiple physicians and has multiple opinions. He was tested for DM, which he reports was negative, he has 5 negative biopsies as well. He reports an initial xray that he also reports was negative. Patient lives locally normally, but travels to Florida for 4 months out of the year. All care has been in Florida, request are being sent here. He has adjusted the insole of all his footwear to offload, he's tried multiple shoes.[28]

Based on this information, Dr. Riedhammer diagnosed an "Atypical open wound of the right plantar foot," and ordered (1) an x-ray, (2) continued offloading, (3) Aquacel Ag change every other day, and (4) continued wound care.[29] The results of the prescribed x-ray were unremarkable.[30]

Plaintiff returned to Geisinger Medical Center on September 1, 2011 and was seen by both Kimberly Pesarchick, PA-C, and Dr. Riedhammer.[31] During this appointment, Ms. Pesarchick noted that the wound appeared to be healing, and the following treatment plan was crafted:

Will continue local care in the interim and re-eval in a few weeks in the dermatology clinic and get their opinion as well. He is healing at this point - records have not yet arrived, will send new request.[32]

Dr. Riedhammer concurred with this treatment plan.[33] Records from this visit also include an "Authorization to Request Medical Information from Another

---

[28] *Id.*

[29] *Id.* at 3–4.

[30] *Id. at 6.*

[31] *See* September 1, 2011 Progress Note (ECF No. 46-9) at 7.

[32] *Id.* at 8.

[33] *Id.*

Facility."[34]  This form was signed and dated by Plaintiff on September 1, 2011, but a handwritten annotation indicates that it was not mailed until September 20, 2011.[35]

On September 21, 2011, Plaintiff returned to Geisinger Medical Center for another appointment.[36]  During this appointment, Ms. Pesarchick noted the following:

> Wound looks the same, foot w/hyperhydrosis. Records have not yet arrived. Suspect wound heals and the skin is too immature and easily damaged d/t perspiration. Sought opinion from Dr Hossler who suggested treating the hyperhidrosis - will re-eval in a few weeks.[37]

A follow-up appointment was scheduled for three weeks later.[38]

Plaintiff attended this follow-up appointment on October 12, 2011.   Records from this appointment indicate that the wound was healing, but Plaintiff was still suffering from hyperhidrosis, or significant perspiration, in his feet.[39]  Specifically, the Progress Note of this date stated the following:

> Wound is improving, foot w/hyperhydrosis which is improving as well, will continue w/local care and offloading. Prescribed orthotic footwear. **Records have not yet arrived**.[40]

---

[34]  ECF No. 46-9, at 10.

[35]  *Id.*

[36]  *See* September 21, 2011 Progress Note (ECF No. 46-9) at 11.

[37]  *Id.*

[38]  *Id.* at 12.

[39]  *See* October 12, 2011 Progress Note (ECF No. 46-9) at 13.

[40]  *Id.* (emphasis added).

Ms. Pesarchick, with Dr. Riedhammer's approval, scheduled a follow-up appointment for six weeks, but indicated in his records that "patient will cancel if healed."[41] Plaintiff thereafter grew disillusioned with his treatment by Geisinger Defendants and, due to a change in his insurance coverage, did not return to their care.[42] On October 14, 2011, Geisinger Defendants received Plaintiff's medical records from Dr. Ramil.[43] These records, including the totality of Plaintiff's medical file save for the Addendum recommending excision, were scanned into his records at Geisinger on October 28, 2011.[44]

### C. From January 2012 through June 2013, Plaintiff was treated by two different wound care specialists. He discontinued treatment with both physicians prior to uncovering his underlying affliction.

Plaintiff sought treatment again in January 2012. First, due to a change in his health care plan, he presented to Chester Yavorski, M.D., a vascular surgeon at the Wound Healing Center of Wilkes-Barre General Hospital.[45] At that time and upon consideration of the non-healing wound, Dr. Yavorski recommended that the

---

[41] *Id.*

[42] Dep. of Lyle Matthew Fidler (ECF No. 46-6), at 461:4-18 (Q. Each time you went back, was there one thing that you heard each and every time at Geisinger? A. Yeah. It's -- after, I don't remember how many visits, but it just seemed to be the same thing over -- you know, it's like a déjà vu. I go in and they say, are you keeping it dry? Yes. Are you using the -- the DuoDERM pads or the Aquacel pads? Yes. Are you wearing your off-loading boot? Yes. We still haven't received your records yet. And -- sorry. Q. No. That's okay. Did you hear that same comment about not having received the records from Dr. Ramil each time you were there? A. Every time.).

[43] *See* Facsimile Transmittal (ECF No. 46-9) at 15.

[44] *Id.*

[45] Dep. of Lyle Matthew Fidler (ECF No. 46-10) at 244:7-9.

wound be debrided.[46]  While Plaintiff was initially agreeable to this procedure, he later canceled it because he wanted to get a second opinion.[47]

Plaintiff thereafter waited another six months before seeking further treatment.[48]  At that time, Plaintiff began treating with wound care specialist, John A. Guerriero, D.O.  Dr. Guerriero referred to Francis J. Collini, M.D., a plastic surgeon, who again recommended excision of the non-healing, open wound.[49] Plaintiff discontinued treatment with Dr. Guerriero entirely in October 2012.[50]

### D. In June 2013, Plaintiff begins treatment with Dr. Bernstein, and receives a diagnosis of previously undisclosed malignant melanoma.

On June 21, 2013, Plaintiff again sought treatment for his non-healing, open wound—this time from Dr. Brent Bernstein, D.P.M., a wound care podiatrist at St. Luke's Hospital – Bethlehem Campus.[51]  During an initial consultation, Dr. Bernstein performed a biopsy of the wound, and learned that Plaintiff had previous biopsies performed by other providers.[52]  A follow-up appointment was scheduled for a week later.[53]

---

[46]  *Id.* at 251:12-13.

[47]  *Id.* at 256:2-3.

[48]  *Id.* at 257:12–258:5.

[49]  *See* Francis J. Collini, M.D. FACS Continuity of Care Document (ECF No. 46-11) at 4.

[50]  Dep. of  Lyle Matthew Fidler (ECF No. 46-10) at 267:8–268:8.

[51]  *Id*. at 269:13–270:3.

[52]  *Id.* at 270:15-22.

[53]  *Id.*

At this appointment on June 28, 2013, Plaintiff was informed by Dr.

Bernstein that he had "malignant melanoma . . . and that the open wound was a

cancerous tumor."[54] This conclusion was based on a Surgical Pathology Report

generated by Emily M. Miller, M.D.[55] During his deposition, Plaintiff stated that

Dr. Bernstein relayed the following additional information concerning his

diagnosis and the records he received from Dr. Ramil:

> And he said -- he actually closed the door and he said, but that's not the
> most disturbing part of this. He said, the most disturbing part is I actually
> received your previous biopsies from Dr. Ramil, and they came back they
> were positive as well.[56]

Indeed, in Dr. Bernstein's medical record from this visit with Plaintiff, he wrote

the following:

> I received biopsy results this week for grade IV melanoma. I also
> received notes from his florida podiatrist showing this was confirmed
> as melanoma in the past. I am not sure how he slipped through the
> cracks.[57]

Per Plaintiff's deposition, Dr. Bernstein further relayed the effect this failure had

on Plaintiff's prognosis, and the potential involvement of other treating physicians:

> A. I think, I think Dr. Bernstein had mentioned, he said, you know,
> when we were having -- I don't remember the exact, you know, this
> was a long time ago still, but I remember a discussion about, you

---

[54] *Id.* at 273:20-21.

[55] St. Luke's University Health Network Surgical Health Network Surgical Pathology Report
(ECF No. 46-12) at 10–14.

[56] Dep. of Lyle Matthew Fidler (ECF No. 46-10), at 274:5-10.

[57] Patient Evaluation Report of 6/28/2013 (ECF No. 46-12), at 21.

know, when these original biopsies were taken, you know, you could
have prob -- it was probably Stage 1 melanoma, versus Stage 3, and at
Stage 1, it probably could have been as easy as, you know, cut out the
margins, minor skin graft, and healing, versus sentinel node biopsy
and all the advanced, you know, once it moves into the lymph nodes.
. . .

Q. Did Dr. Bernstein comment to you what he thought the
advancement of the disease, if at all, had Dr. Riedhammer or the folks
over at Geisinger, in September/October of 2011, had they got the
results, what the difference would have been in your disease from that
point up until the time you were diagnosed in 2013?

A. I don't remember us having a discussion about Geisinger other
than after he gave me my diagnosis, he said I would recommend that -
- because I had told him the story about how I had been to all the
doctors. And he said, I'd recommend that you get all of your records
from all of your doctors. He said, if you've never seen this, what else
haven't you seen kind of approach.[58]

### E. Plaintiff requests his medical records from Geisinger Defendants. While said records do not include the 2011 Pathology Report, Plaintiff nevertheless institutes this action on August 15, 2015.

In July 2013, Plaintiff requested and received medical files from Geisinger

Defendants which did not include the 2011 Pathology Report.  The factual record

as developed explains this omission as follows.  Received by Geisinger on October

14, 2011 and inputted into Plaintiff's file on October 28, 2011, these records were

not produced in response to the document request for lack of responsiveness.

Indeed, during the deposition of Janet L. Anderson, a corporate designee for

Geisinger Medical Center and at oral argument in this matter, a process was

---

[58]   Dep. of  Lyle Matthew Fidler (ECF No. 46-10), at 279:23–280:8; 280:19–281:6.

described wherein a documents' responsiveness is dependent on both the identity

of the treating physician and the date on which the document was generated:

> Q. But didn't you tell me that it became a Geisinger record the moment it was scanned on October 28, 2011?
>
> A. It does, but that doesn't mean it's part of what somebody asked to receive.
>
> . . .
>
> Q. Are you able to tell me why pages Geisinger 46 to Geisinger 56, including notes from Dr. Ramil and pathology records from Bako Pathology Services, which were part of Mr. Fidler's chart as of October 28, 2011, were not sent out in response to this request from Dr. Bernstein?
>
> A. So when our staff look at this request, they're focusing that it's asking for a specific physician name and it's asking for -- it's naming Geisinger on it, Geisinger Hospital, so they would look for entries by that physician; they would look in this date range. These outside scans are from an earlier time frame and they -- they weren't authored by this person that they're asking for those notes.[59]

It was not until July 2015, following the commencement of a lawsuit against Dr.

Ramil, that Plaintiff became aware of a fax cover sheet intimating that medical

records had in fact been sent to Geisinger Defendants.[60]

---

[59] Dep. of Janet L. Anderson (ECF No. 49-19) at 72:2-6; 72:22–73:12; *see also* Oral Argument Transcript (ECF No. 54), at 55:12–17 (Mr. Lieberman: . . . Okay. A file clerk got the request, looked up the records and said okay, the plaintiff wants his – the patient wants the records from June 2011 to December of 2011. She pulls the records. Dr. Ramil treated this patient in February of 2011, March 2011, basically the first half of year. But the patient asked for his records in the second half of the year.).

[60] Oral Argument Transcript (ECF No. 54), at 20:10-25.

Plaintiff nevertheless filed a Complaint on August 16, 2015 against

Geisinger Defendants alleging that they "departed from the accepted standard of

care in caring for and treating Mr. Fidler, causing or increasing the risk that Mr.

Fidler would suffer the damages set forth in this Complaint, in that they:

> a. Failed to follow accepted protocol for assessing their patient's medical history;
>
> b. Failed to make a proper and timely assessment of the risk that Mr. Fidler had developed malignant melanoma;
>
> c. Failed to obtain a complete and accurate medical history;
>
> d. Failed to order biopsies of Mr. Fidler's right foot;
>
> e. Failed to refer Mr. Fidler to another medical provider to obtain biopsies of his right foot;
>
> f. Made an incomplete and inaccurate diagnosis of the cause and nature of Mr. Fidler's wounds;
>
> g. Made an incomplete and inaccurate diagnosis of Mr. Fidler that precluded timely treatment of his malignant melanoma;
>
> h. The staff of Geisinger either failed to timely obtain Mr. Fidler's medical records from Florida and/or failed to timely inform Reidhammer and Pesarchick of their arrival at Geisinger.[61]

Following a confirmation that Geisinger Derfendants had received the 2011

Pathology Report, an Amended Complaint was filed on November 16, 2015.[62]  In

this Complaint, the factual basis for Plaintiff's medical malpractice claims was

modified to the following:

---

[61]  Compl. (ECF No. 1) ¶ 28, at 6–7.

[62]  Am. Compl. (ECF No. 15) ¶ 28, at 6–7.

a. Failed to have a mechanism in place to review incoming medical records such as pathology reports of biopsies ordered to rule out a deadly disease like cancer.

b. Failed to review the pathology reports showing malignant melanoma or failed to appreciate the seriousness of the reports;

c. Failed to inform Mr. Fidler of the existence of the pathology reports showing malignant melanoma;

d. Failed to order any follow up care and treatment to confirm the diagnosis of cancer and start treatment by referral to a specialist, or otherwise;

e. The staff of Geisinger failed to timely inform Riedhammer and Pesarchick of the fax transmission of Mr. Fidler's pathology reports.[63]

## III.  LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[64] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[65]

"Facts that could alter the outcome are 'material facts,' and disputes are

---

[63]  *Id.* ¶ 28, at 6–7.

[64]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[65]  Fed. R. Civ. P. 56(a).

'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[66] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[67] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[68]

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[69] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[70] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

---

[66] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex Corp.*, 477 U.S. at 322).

[67] *Clark*, 9 F.3d at 326.

[68] *Id.*

[69] *Liberty Lobby, Inc.*, 477 U.S. at 252.

[70] *Id.*

could reasonably find for the plaintiff."[71] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[72] Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[73] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[74]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that

---

[71]  *Id.*

[72]  *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

[73]  *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted).

[74]  *Id.*

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[75]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[76]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[77]  Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[78]  On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[79]

---

[75] *Liberty Lobby, Inc.*, 477 U.S. at 250.

[76] Fed. R. Civ. P. 56(c)(1).

[77] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[78] Fed. R. Civ. P. 56(e)(2).

[79] Fed. R. Civ. P. 56(c)(3).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[80] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[81] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[82]

## IV. ANALYSIS

This is a medical malpractice case predicated on this Court's diversity jurisdiction, and brought under Pennsylvania law.[83] The statute of limitations for medical malpractice actions in Pennsylvania is two years.[84] This limitations period begins to run as soon as the underlying cause of action accrues, i.e. when the injury is sustained.[85] If a cause of action has accrued and the injured party fails to file an action within the applicable statutory period, they are thereafter barred from bringing suit unless the statute of limitations has been tolled.[86] The instant case

---

[80] *Liberty Lobby, Inc.*, 477 U.S. at 249.

[81] *Id.*

[82] *Id.* at 249–50 (internal citations omitted).

[83] *Calle v. York Hosp.*, 232 F.Supp.2d 353, 357 (M.D.Pa. 2002)("The court applies state substantive law when federal jurisdiction is based on diversity of citizenship.")(citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938)).

[84] 42 Pa.C.S.A. § 5524(2).

[85] *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (1983).

[86] *Id.*

calls upon me to discern whether a tolling doctrine applies to save otherwise time-barred claims.

In their Motion for Summary Judgment, Geisinger Defendants argue that Plaintiffs' claims of negligence and loss of consortium[87] are time barred, and that even the most generous application of the discovery rule or fraudulent concealment doctrines does not negate this result. Plaintiff of course resists this conclusion and argues that, while he was formally diagnosed with previously undiagnosed and untreated melanoma more than two years before his filing of a formal Complaint, the statute of limitations was nevertheless tolled under the discovery rule and fraudulent concealment doctrines based on his lack of knowledge that Geisinger Defendants possessed the 2011 Pathology Report. In accordance with the reasoning below, I find that Plaintiff's claims accrued on June 28, 2013 and no genuine dispute of material fact thus exists as to the applicability of these tolling doctrines. Plaintiffs' claims therefore remain time-barred as a matter of law.

### A. The Discovery Rule Doctrine Cannot Save Plaintiff's Time-Barred Claims.

The discovery rule applies to "toll[] the statute of limitations during the 'plaintiff's *complete inability*, due to facts and circumstances not within his

---

[87] Plaintiff Lisa Fidler's loss of consortium claim is derivative of her husband's negligence claims against Defendants and is thus governed by the statute of limitations of these source claims. *See Patterson v. American Bosch Corp.*, 914 F.2d 384, 386 n.4 (3d Cir. 1990).

control, to discover an injury despite the exercise of due diligence.' "[88] This judicial construct "operates to balance the rights of diligent, injured plaintiffs against the interests of defendants in being free from stale claims."[89] Under the application of this rule, the statute of limitation therefore begins to run for a claim when "'the plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.' "[90]

"Reasonable diligence," which requires that the plaintiff "inform himself or herself properly of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed statutory period,"[91] is generally a question of fact for a jury. However, a court is free to resolve the discovery rule question at summary judgment where reasonable minds would not differ on the plaintiff's diligence.[92] The burden of proof for establishing the applicability of the discovery rule rests with the plaintiff.[93]

In the instant matter, Geisinger Defendants argue that, even assuming a generous application of the discovery rule, Plaintiff nevertheless learned of his

---

[88] *Blanyar v. Genova Products, Inc.*, 861 F.3d 426, 431–32 (3d Cir. 2017)(quoting *Kingston Coal Co. v. Felton Mining Co.*, 690 A.2d 284, 288 (1997)) (emphasis added).

[89] *Wilson v. El-Daief*, 964 A.2d 354, 366 (Pa. 2009).

[90] *Romah v. Hygenic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. Ct. 1997) (quoting Redenz ex. rel. Redenz v. Rosenberg, 520 A.2d 883, 885 (Pa. Super. Ct. 1987)).

[91] *Blanyar*, 861 F.3d at 432 (citing, *inter alia*, *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985)).

[92] *Wilson,* 964 A.2d at 359.

[93] *Id.*

injury and its cause, and the statute of limitations unquestionably began running on June 28, 2013. Specifically, on that date, Plaintiff learned that he had biopsy-proven melanoma which dated back to his 2011 treatment with Dr. Ramil. The melanoma was undiagnosed and untreated by subsequent medical providers, including Geisinger Defendants. Given this June 28, 2013 accrual date, Geisinger Defendants argue that Plaintiff's August 16, 2015 Complaint was untimely because it was filed fifty-four days following the expiration of the applicable two-year statute of limitations.[94]

Plaintiff resists this conclusion by arguing that, despite the June 28, 2013 diagnosis, he was reasonably unaware of the cause of his injury until, at the very earliest, August 16, 2013. Plaintiff specifically avers that it was on this date that Geisinger Defendants, pursuant to a request, produced Plaintiff's medical records for the first time. Assuming that reasonable diligence as a matter of law would require him to then specifically request the 2011 Pathology Report, Plaintiff argues that this is the earliest date upon which his claim can be found to have accrued. Acceptance of this date would render Plaintiff's Complaint timely.[95]

Upon consideration of the factual record read in the light most favorable to Plaintiff, I find that the two-year statute of limitations was not tolled pursuant to

---

[94] Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.")(ECF No. 46), at 24–27.

[95] Pl.'s Br. in Opp. To Mot. for Summ. J. ("Pl.'s Br.")(ECF No. 49), at 19-23.

the discovery rule. As noted above, following a lengthy and undoubtedly frustrating quest for answers, Plaintiff presented to Dr. Brent Bernstein, D.P.M. on June 21, 2013 for an initial consultation.[96] During that visit, Dr. Bernstein performed his own biopsy of the wound bed, and learned that Plaintiff had previous biopsies performed by other providers.[97]

At a follow-up appointment on June 28, 2013, Plaintiff was informed by Dr. Bernstein that, based on a Surgical Pathology Report generated by Emily M. Miller, M.D., he had "malignant melanoma . . . and that the open wound was a cancerous tumor."[98] As noted above, Plaintiff stated during his deposition that Dr. Bernstein relayed the following information concerning a failure by previous physicians concerning his illness and the results of the 2011 Pathology Report:

> And he said -- he actually closed the door and he said, but that's not the most disturbing part of this. He said, the most disturbing part is I actually received your previous biopsies from Dr. Ramil, and they came back they were positive as well.[99]

This conversation was confirmed in Dr. Bernstein's medical record of this visit, in which he wrote the following:

> I received biopsy results this week for grade IV melanoma. I also received notes from his florida podiatrist showing this was confirmed

---

[96] Dep. of Lyle Matthew Fidler (ECF No. 46-10), at 269:13–270:3.

[97] *Id.* at 270:15-22.

[98] *Id.* at 273:20-21; St. Luke's University Health Network Surgical Health Network Surgical Pathology Report (ECF No. 46-12) at 10–14.

[99] Dep. of Lyle Matthew Fidler (ECF No. 46-10), at 274:5-10.

as melanoma in the past. I am not sure how he slipped through the cracks.[100]

Plaintiff has formulated the "injury" suffered at hands of Geisinger Defendants as an "increased risk of harm" resulting from the failure to diagnose and/or treat his melanoma. Based on this formulation, I find as a matter of law that any claims against Geisinger Defendants accrued on the date of this diagnosis and without his knowledge that Geisinger Defendants possessed the 2011 Pathology Report. Specifically, while Plaintiff concedes that "injury" did not require an appreciation that "Geisinger specifically 'breached a standard of care' in medicine (i.e., was negligent) or [an understanding of] the 'precise' cause of injury in order for the statute of limitations clock to start running,"[101] acceptance of his argument requiring knowledge of Geisinger Defendants' possession of the 2011 Pathology Report would nevertheless implicate a standard of "legal injury" explicitly rejected by Pennsylvania courts. Here's why.

In *Wilson v. El–Daief*, the Pennsylvania Supreme Court explained that *Fine v. Checcio*—the seminal case concerning Pennsylvania's discovery rule—reflected a "narrower" view of discovery rule doctrine.[102] The *Wilson* Court specifically wrote that, while a schism exists between courts that "have equated 'injury' with

---

[100] Patient Evaluation Report of 6/28/2013 (ECF No. 46-12), at 21.

[101] Pl.'s Br. at 20–21.

[102] *Wilson,* 964 A.2d at 362.

- 24 -

'legal injury'" and those that have employed "a stricter approach . . . tying commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause," Pennsylvania's formulation reflects the latter, and more narrow, of these approaches.[103]  This formulation therefore places a greater burden on plaintiffs, whereby "[t]he commencement of the limitations period is grounded on 'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, **the fact of actual negligence, or precise cause**.' "[104]

Here, the undisputed facts establish that, on June 28, 2013, Plaintiff had inquiry notice of "injury," but not necessarily "legal injury," attributable to the actions of Geisinger Defendants.  Indeed, both the actions and words of Plaintiff acknowledge that "injury" by Geisinger Defendants, as learned on June 28, 2013, extends beyond the legal theory of "failure to act" on the 2011 Pathology Report to a broader formulation of injury.  Specifically, the original Complaint, filed on August 16, 2015, contains the following factual averments unrelated to possession of the records:

---

[103]  *Id.* at 364.

[104]  *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011)(quoting *Wilson*, 964 A.2d at 364)(emphasis added); *see also Mest v. Cabot Corp.,* 449 F.3d 502, 510–11 (3d Cir. 2006) ("[A] plaintiff need not know the 'exact nature' of his injury, as long as it objectively appears that the plaintiff 'is reasonably charged with the knowledge that he has an injury caused by another.' " (citation omitted)).

a. Failed to follow accepted protocol for assessing their patient's medical history;

b. Failed to make a proper and timely assessment of the risk that Mr. Fidler had developed malignant melanoma;

c. Failed to obtain a complete and accurate medical history;

d. Failed to order biopsies of Mr. Fidler's right foot;

e. Failed to refer Mr. Fidler to another medical provider to obtain biopsies of his right foot;

f. Made an incomplete and inaccurate diagnosis of the cause and nature of Mr. Fidler's wounds;

g. Made an incomplete and inaccurate diagnosis of Mr. Fidler that precluded timely treatment of his malignant melanoma.[105]

Furthermore, the factual record contains an additional corroboration by Plaintiff concerning the above cited failure to "obtain a complete and accurate medical history":

BY MR. COVITZ:

Q. All right. Now, you signed the authorization. I wish it was a different color. You mentioned you signed an authorization at Geisinger so that they could get the records and the path reports from Dr. Ramil; do you recall that?

A. Yes.

Q. And do you know what day you actually filled it out and signed it?

A. August 9th.

Q. Well—

---

[105] Compl. (ECF No. 1) ¶ 28, at 6-7.

A. I did it a couple times, but I know because I filled out the initial forms, and then they brought the HIPPA form into the meeting room or the appointment room, and then I filled out the form there so they could get the records.

. . .

Q. And you don't know when Geisinger actually took time to send it to the –

A. I'm pretty sure I filled out one of these forms for every one of my appointments at Geisinger –

Q. All right.

A. -- which whatever dates they coincide with, and every appointment at Geisinger, I said, did you get the – you know, because we had, it was -- I remember having a "Who's On First" conversation with and I apol - - the girl, Dr. Pesarchick; is that her name?

    MS. BRYAN: Kim Pesarchick, Physician's Assistant.

    THE WITNESS: Yeah. And I don't mean disrespectfully.

    MS. BRYAN: Right. I know.

    THE WITNESS: But Pesarchick, right?

    MS. BRYAN: That's it.

    THE WITNESS: I said, don't you remember the last time I came in here and I filled out this form? And she said, I'm sorry, could you just fill this one out again? And I'm like, no problem. Filled it out again, and then the next time I came back, then she goes, did you get the records? And I said, you were sending for the records.

> She said, oh. And I'm like. She's like, will you fill out
> this form for me? I'm like, I filled out the form last time I was
> here, and you know it was Ground Hog Day.[106]

It was only in Plaintiff's Amended Complaint, filed on that November 16, 2015, that the factual basis for his medical malpractice claim was amended to be based on the alternative—and likely stronger—theory that Geisinger Defendants possessed, but failed to act on the 2011 Pathology Report.[107] Such an amendment of legal theory cannot save claims which were nevertheless time-barred in the first instance.[108]

In his papers and at the oral argument held on this matter, Plaintiff further argued that his knowledge of Geisinger Defendants' possession of the 2011 Pathology Report was required for accrual because its absence would have prevented him from filing a suit. Specifically, Plaintiff avers that "had Geisinger not received the pathology reports, there would be no case against [them]."[109] This argument, necessarily implicating both Pennsylvania's requirement of a Certificate of Merit and again "legal injury," was repeated by Plaintiff's counsel in the following exchange at oral argument:

---

[106] Dep. of Lyle Matthew Fidler (ECF No. 49-10), at 190:23–191:13; 192:4–193:7. At oral argument held by the Court, counsel for Geisinger Defendants also argued that the initial Complaint recognizes an alternate theory of negligence, broader formulation of injury. *See* Oral Argument Transcript (ECF No. 54), at 51:18–52:5.

[107] *See generally* Am. Compl. (ECF No. 15).

[108] *Schach v. Ford Motor Co.*, 210 F.R.D. 522, 523 (M.D.Pa. 2002)(Caputo, J.)(citing *Aivazoglou v. Drever Furnaces*, 613 A.2d 595 (1992)).

[109] *Id.* at 15.

<u>Mr. Doyle</u>:

. . .

But we had no case because we had no path reports connecting the conduct of Geisinger to what ultimately happened to Matt, to Mr. Fidler.

So when we filed the lawsuit -- or when we get the records from Dr. Ramil in the pre-suit period, quote, the pre-suit period in discovery, there's a fax cover sheet on October 13th, the last day that he was at Geisinger, because he called her and said hey, get the records over. What's going on with these records. So, there is finally a fax cover sheet to Geisinger from Ramil. It didn't say how many pages. It didn't say what was faxed. It was a little bit vague. So we brought that to our experts. They said okay, well, here's the connection. I feel comfortable I can file -- I can, you know, sign on to a certificate of merit because we now have a connection to Ramil sending these pathology reports to Geisinger.[110]

This argument, however, was previously addressed and rejected by the

Pennsylvania Supreme Court in *Wilson*.

In that case, the Honorable Thomas G. Saylor, now Chief Justice of

Pennsylvania, addressed the interplay between Pennsylvania's certificate-of-merit

requirement[111] and its approach to the accrual of causes of action under the

discovery rule.[112]  Specifically, Justice Saylor noted that the decision by the

Pennsylvania General Assembly to require certificates of merit in professional

malpractice actions was not accompanied by a modification of the state's approach

---

[110]  Oral Argument Transcript (ECF No. 54), at 20:10-25.

[111]  Pa.R.C.P. 1042.3.

[112]  *Wilson*, 964 A.2d at 366–70.

toward the accrual of actions under the discovery rule.[113]  Given that the ultimate goal of this certificate of merit requirement was "to further cost containment and reasonable promptitude," Justice Saylor concluded that this  concurrent failure to modify evidences the legislature's belief that "the existing rule [of tying the commencement of the limitations period to actual or imputed knowledge of injury and cause] remained adequate to strike an appropriate balance between the objectives motivating statutory limitations periods and the interests of injured persons."[114]

Justice Saylor then addressed an argument by dissenting Justice Max Baer that "many plaintiffs are deprived of their day in court because they are unable to obtain a certificate of merit within two years after discovery of injury and cause."[115]  In response, Justice Saylor noted the existence of devices which could alleviate this concern, such as the use of a writ of summons and the availability of extensions and special discovery.[116]  He ultimately concluded that, while Justice Baer's position requiring specific medical evidence supporting a cause of action is "one way to address the important interests in tension in these cases," this was not

---

[113]  *Id.* at 368.

[114]  *Id.*

[115]  *Id.*

[116]  *Id.* at 369.

reflected in Pennsylvania's statutory scheme and would not be recognized by the court.[117]

The progeny of cases following *Wilson* has recognized this narrow view of the discovery rule doctrine and its corresponding rejection of this definition of "legal injury." For example, in *Nicolao v. Martin*, the Pennsylvania Superior Court was confronted with a factual scenario in which the plaintiff argued that the discovery rule should toll the statute of limitations against a prior medical provider until diagnostic testing confirmed a previously-rendered clinical diagnosis.[118] Rejecting this formulation of the discovery rule, the *Nicolao* Court found that, once clinically diagnosed, plaintiff knew or should have known that she suffered an injury and that "her long-standing health problems may have been caused by [her previous medical provider's] failure to diagnose and treat her."[119] The court cited as support the "greater burden placed upon Pennsylvania plaintiffs *vis-á-vis* the discovery rule" and its limited requirement of:

> 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.' "[120]

---

[117] *Id.*

[118] 153 A.3d 383, 391 (Pa. Super. Ct. 2016).

[119] *Id.* at 395.

[120] *Id.* (quoting *Gleason*, 15 A.3d at 484–485).

Similarly, in *Danysh v. Eli Lilly and Co.*, the Honorable John E. Jones III of this Court, granted summary judgment to a defendant by finding that the plaintiff's otherwise time-barred claims could not be saved through application of the discovery rule doctrine.[121] Specifically, Judge Jones rejected the plaintiff's argument that, prior to the receipt of medical evidence, his claim against defendants did not accrue because he "lacked sufficient knowledge to support a viable defense in his criminal case or in a civil action."[122] He concluded that "awareness of injury and suspicion of a cause of action are enough to begin the running of the limitations period."[123] This conclusion was later affirmed on appeal,[124] and is in accord with other decisions within this Circuit.[125]

Based on the above reasoning in conjunction with my review of the factual record, I find Plaintiff knew, through his June 28, 2013 diagnosis, that he had melanoma as early as 2011 and his subsequent physicians failed to inform and/or

---

[121] Civil Action No. 10-CV-2116, 2011 WL 4344595, at *3 (M.D.Pa. Sept. 15, 2011).

[122] *Id.*

[123] *Id.*

[124] *Danysh v. Eli Lilly and Co.*, 461 F. App'x. 75 (3d Cir. 2012).

[125] *See, e.g., Leonard v. City of Pittsburgh*, Civil Action No. 13-CV-455, 2013 WL 4541727, at *6 (W.D.Pa. Aug. 27, 2013)(finding that, for purposes of the discovery rule, it does not matter under *Wilson* and *Meehan* that plaintiff did not realize until later that she may have been the victim of a type of **legal wrong** that could form the basis of a legal claim); *Brown v. DaVita, Inc.*, Civil Action No. 09-CV-3892, 2011 WL 5523823, at *4-5 (E.D.Pa. Nov. 14, 2011)(granting judgment to Defendant on a defamation claim where plaintiff had known of her injury outside the statute of limitations and rejecting an argument that knowledge of cause of action is required for a cause of action to accrue).

treat him accordingly.[126]  As a matter of law, the statute of limitations began to run on that date.  Plaintiff's argument to the contrary, relying on an unsupported formulation of "legal injury," is therefore unavailing and insufficient to prevent the imposition of summary judgment.

### B.    The Fraudulent Concealment Doctrine Cannot Save Plaintiff's Time-Barred Claims.

The doctrine of fraudulent concealment "'provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance of deviate from his right of inquiry into the facts.'"[127]  Based on a theory of estoppel, this doctrine applies where the defendant has deceived the plaintiff, intentionally or unintentionally, such that the plaintiff is unaware of **the injury and its cause**.[128]  If fraudulent concealment has occurred, the statute of limitations does not thereafter commence "until the time of discovery or the date when with reasonable diligence one would have been led to discovery."[129]  A plaintiff bears the burden of proving this doctrine's applicability

---

[126]  *See MacCain v. Montgomery Hosp.*, 578 A.2d 970 (Pa. Super. Ct. 1990); *DeMartino v. Albert Einstein Medical Center, Northern Div.*, 460 A.2d 295 (Pa. Super. Ct. 1983); *Citsay v. Reich*, 551 A.2d 1096 (Pa. Super. Ct. 1988).

[127]  *Blanyar*, 861 F.3d at 430 n. 4 (quoting *Fine v. Checcio*, 879 A.2d 850, 860 (Pa. 2005)).

[128]  *Fine,* 870 A.2d at 860–61(emphasis added); *see also Mest,* 449 F.3d at 517 (requiring plaintiff to demonstrate an act of concealment on the part of the defendant that "would divert or mislead the plaintiff from discovering the injury").

[129]  *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1274 (3d Cir. 1987) (emphasis in original).

by "clear, precise, and convincing evidence."[130]  In *Fine v. Checcio*, the

Pennsylvania Supreme Court stated "[w]hile it is for the court to determine

whether an estoppel results from established facts, it is for the jury to say whether

the remarks that are alleged to constitute the fraud or concealment were made."[131]

In the instant matter, Plaintiff argues that the statute of limitations was tolled

through this theory of estoppel when, following his June 28, 2013 diagnosis, he

requested his medical records from Geisinger Defendants and these records were

returned without the 2011 Pathology Report.[132]  The argument follows therefore

that said omission caused Plaintiff to relax his right of inquiry into the facts

because, without knowledge that Geisinger Defendants possessed said records,

Plaintiff had no injury at their hands.  Geisinger Defendants in turn argue that

application of this doctrine will not save Plaintiff's time barred claims because, per

*Fine v. Checcio*, this doctrine employs the same standard for when the statute of

limitations accrues as the discovery rule.[133]

Viewing the factual record in the light most favorable to Plaintiff, I

nevertheless find that he has not proven by "clear, precise, and convincing

evidence" that an estoppel has resulted.  The fraudulent concealment doctrine

---

[130]  *Fine*, 870 A.2d at 860 (citing *Molineux v. Reed*, 516 Pa. 398, 532 A.2d 792, 794 (1987)).

[131]  *Id.*

[132]  Pl.'s Br. at 14–19.

[133]  Def.'s Reply in Supp. of Mot. for Summ. J. ("Reply Brief")(ECF No. 50), at 15.

therefore does not save Plaintiff's claims.  In reaching this conclusion, I note that the doctrine of fraudulent concealment employs the same standard as the discovery rule and, in relying on Geisinger Defendants' non-production of the 2011 Pathology Report, Plaintiff is again relying on a foreclosed theory of "legal injury."  As explained above, this argument fails as a matter of law.

In *Stroud v. Abington Memorial Hosp.*, the Honorable David R. Strawbridge of the United States District Court for the Eastern District of Pennsylvania, presented with a factually analogous scenario, granted summary judgment in favor of defendant medical professionals.[134]  In that case, the plaintiff argued that, because the hospital had failed to produce a radiology report which served as the lynchpin of his legal claims against the moving defendants, the fraudulent concealment doctrine applied to prevent application of the statute of limitations.[135]  The defendants in response argued, *inter alia*, that other records produced "gave Plaintiff ample notice of . . . any potential negligence claims against them."[136]  Magistrate Judge Strawbridge accepted this latter argument and found that there was "substantial factual basis upon which to reasonably conclude that [plaintiff] had been medically injured and the cause of that injury."[137]  For example,

---

[134]  Civil Action No. 06-CV-4840, 2008 WL 2061408 (E.D.Pa. May 13, 2008).

[135]  *Id.* at 13.

[136]  *Id.*

[137]  *Id.*

Magistrate Judge Strawbridge noted plaintiff's firsthand knowledge of his father's symptoms, the report of the autopsy performed, and other medical records received prior to the expiration of the limitations period.[138]

Furthermore, while Plaintiff here in essence argues that Geisinger Defendants' concealment of the 2011 Pathology Report prevented them from gaining knowledge of injury and cause supporting a legal claim, I note that Plaintiff's own actions contradict this statement. In *Johnson v. SmithKline Beecham Corp.*, the Honorable Paul S. Diamond of the Eastern District of Pennsylvania, granting summary judgment in favor of defendant drug manufacturers, found that the fraudulent concealment doctrine did not apply to save the plaintiff's otherwise time-barred claims.[139] Judge Diamond reasoned that, while the plaintiff cited misrepresentations by defendants on which he allegedly relied to his detriment, the factual record did not confirm such reliance.[140] Judge Diamond specifically wrote the following:

> Moreover, Defendants' alleged misrepresentations never lulled Plaintiff into an incorrect understanding that he had no reason to proceed against Defendants. As pled, Plaintiff's parents told him thalidomide caused his birth defects. Indeed, Plaintiff's father tried to sue the doctor who prescribed the drug. As I have explained, Plaintiff failed to pursue claims

---

[138] *Id.*

[139] 55 F.Supp.3d 603, 616 (E.D.Pa. 2014).

[140] *Id.*

against Defendants because of a lack of diligence, not because of Defendants' purported fraud.[141]

The above persuasive case law leads the Court to two conclusions. First, while Plaintiff argues that Geisinger Defendants' failure to produce the 2011 Radiology Report in July 2013 constituted fraudulent concealment sufficient to toll the statute of limitations, this argument relies upon a formulation of "legal injury" that is legally foreclosed. Second, Plaintiff's contention that this failure by Geisinger Defendants to produce the 2011 Pathology Report effectively relaxed his vigilance is contradicted by his own actions. Specifically, and as noted and detailed more fully above, Plaintiff filed an August 15, 2015 Complaint which, by any reasonable interpretation, was premised at least in part on conduct independent of the 2011 Pathology Report.[142]

Therefore, I find that the factual record, viewed in the light most favorable to Plaintiff, does not prevent the issuance of summary judgment in favor of Geisinger Defendants on this alternative tolling doctrine. Specifically, as no genuine dispute of material fact remains concerning the fraudulent concealment, I find that Geisinger Defendants are entitled to summary judgment as a matter of law. Plaintiff's claims remain time-barred.

---

[141] *Id.*

[142] *See* ECF No. 1.

## V.    CONCLUSION

Based on the above reasoning, Defendants Geisinger Medical Center; Marcus M. Riedhammer, M.D., CWSP; Riedhammer, Marcus M., M.D., P.C.; and Kimberly Pesarchick, PA-C's Motion for Summary Judgment will be granted in its entirety.  The Clerk of Court is directed to close this case.

An appropriate Order follows.

BY THE COURT

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge